M. E. TRAPP, ASSOCIATED, v. TANKERSLEY et al.

No. 32239.  Oct. 7, 1947.

Rehearing Denied March 30, 1948.

*191 P. 2d 202.*

Ray Morrison, of Oklahoma City, for plaintiffs in error.

Looney, Watts, Fenton & Billups, of Oklahoma City, for defendants in error.

WELCH, J.   This action was commenced by Dan Tankersley and Mary Tankersley, copartners, doing business under the firm name of Tankersley Construction Company, and Tankersley Construction Company, a corporation, against M. E. Trapp, Lou Strang Trapp, and M. E. Trapp, Jr., partners doing business under the name of M. E. Trapp Associated, for an accounting and distribution of money.

The parties had theretofore operated together as limited partners or joint adventurers in constructing several large governmental or army-navy projects under contract with the Federal Government, and had accumulated substantial profits in money and assets, for their equal benefit or for division equally one-half to Trapp or the Trapp group and one-half to Tankersley, or to the Tankersley group.  The purpose of this suit was to obtain an accounting, an adjudication of individual claims made by each of the parties against the entity or the fund on hand, and for division of the assets, on the theory that the partnership or joint adventure had terminated or been dissolved.

Defendants asserted in effect that the plaintiffs' claim for accounting and distribution of funds on or in connection with the projects or ventures involved, was premature in that the parties had, on December 31, 1942, executed a dissolution agreement prior to suit on March 2, 1944, which provided the future rights of the parties.

It was defendants' position that such contract justified his refusal to permit distribution of the funds on hand, or payment to plaintiff of his or their share thereof.  It was plaintiffs' position and sufficient time had elapsed (1 year and 2 months) and that nothing then re-

mained to hinder or further delay distribution of the profits and payment to him of his share, and after demand this suit was filed.

Also by cross-petition the defendants sought an accounting of the profits received by plaintiffs for work on the Norman Naval Base, a project not mentioned in plaintiffs' petition, and which plaintiffs contended belonged individually to them, or was wholly separate and apart from projects handled jointly by plaintiffs and defendants. Plaintiffs contended the defendants specifically declined participation in the Norman project. The defendants contended to the contrary.

At the conclusion of the evidence the trial court rendered a judgment in accounting and for distribution, dividing the funds on hand in nearly equal amounts to plaintiff and defendant; the difference being accounted for by specific findings on several claims of each party for individual credits, some of which were allowed and some disallowed under the evidence. The trial court also denied defendants any right in the Norman project.

Defendants appeal and seek reversal of the judgment for plaintiff for his distributive share of the money and also attack the judgment denying defendants any recovery on the Norman project item. Additional facts will be mentioned in connection with the error assignments to which they relate.

Assignments of error are presented by groups under separate propositions. Under proposition 1, errors are assigned as follows:

(1.) Error of the court in overruling the defendants' objection to the introduction of further evidence.

(2.) Error of the court in receiving evidence upon the condition of the accounts before the plaintiff had established his right to an accounting.

(3.) Error of the court in overruling the demurrer to the evidence.

(4.) Error of the court in its finding that the plaintiffs were entitled to an accounting.

Argument is presented that the petition does not state a cause of action for an accounting and that the evidence is insufficient to support an action for an accounting. It is contended the contract of December 31, 1942, as pleaded and as shown by the evidence, sets forth the rights and obligations of the parties, and that any rights that plaintiffs have are embodied in the terms of the contract, and may not be recovered in an action such as this.

By written agreement as of March 23, 1942, the parties agreed that Trapp should have custody, receipt and disbursement of the funds of the entity composed of the Trapp group and the Tankersley group, and that after all obligations had been paid that Trapp and Tankersley should share equally in the profits or losses from the ventures.

On November 15, 1942, the parties signed a memorandum making reference to joint operations by the parties as coadventurers, and in limited partnership, in construction of projects at Fort Sill and Enid, Okla., and Camp Hood, Killeen, Tex., and the accumulation of equipment, supplies and materials as shown by the books at a total cost of $49,298.55; that the projects had been completed except the last, the Camp Hood project then being completed, as provided for in the government contract, and that it was the desire and purpose of the parties to discontinue any further joint operations for coadventures and to dissolve the limited partnership by reason of said government contract as soon as the same was completed and all accounts had been paid; that it was the desire of the parties to make appropriate disposition of said equipment and materials so accumulated and which are owned by said parties in equal proportion.

The contract under date of December 31, 1942, makes reference to the association of the parties as joint operators,

coadventurers and in limited partnership in the construction of certain defense projects at Fort Sill and Enid, Okla., and Killeen, Tex., and the accumulation of certain equipment, materials and merchandise and provides for a division and disposition of these joint owned properties. The agreement further provides:

"It is understood and agreed that the books, records, papers, invoices, and other instruments incident to and pertaining to the work and completion of same under any and all of the projects mentioned hereinabove shall be moved to Oklahoma City, and shall be brought down to date and each of the parties, Dan Tankersley and M. E. Trapp, shall designate some capable accountant to jointly audit and bring to a permanent state and final conclusion the complete status of the record of all transactions pertaining to any and all business had by and between the parties hereto as set forth in Paragraph One (1) hereof.

"That any funds arising therefrom, after all accounts and obligations have been fully paid and liquidated shall be equally divided between the parties thereto, except a sufficient amount shall be withheld and kept thereafter under joint control to cover any expectancy of unforeseen obligations or condition that might arise so long as any likelihood thereof shall exist."

The petition alleges a partnership, the termination of the partnership and the completion of their joint adventures. The duty of each member of a partnership to make an accounting is set forth by statute. 54 O.S. 1941 §11.

As said in Wolfe v. North, 182 Okla. 520, 78 P. 2d 764:

"The cause of action of one member of a joint adventure to compel an accounting and to recover his share of the profits realized therefrom accrues on the completion of the joint adventure."

In 40 Am. Jur., Partnership, 325, the following general rule is stated:

"There is an implied obligation between general partners that on the termination of the partnership they will account to each other and settle and pay any balance due among themselves."

The dissolution agreement does not appear to provide for a final settlement of the partnership affairs so as to constitute an account stated and restrict plaintiff to any action under the contract.

"It is a general rule that one partner cannot maintain an action at law against another to recover an amount claimed by him by reason of partnership transactions until there has been a final settlement of the affairs of the partnership by discharging its liabilities, collecting its assets, and definitely ascertaining the surplus to a share of which he is entitled. Until this is done, a partner's only remedy is to apply to a court of equity for a dissolution and accounting and ascertainment of such balance." Burbank Garage v. U. S. F. & G. Co., 144 Okla. 163, 289 P. 1109.

The agreement provides that each of the parties "shall designate some capable accountant to jointly audit and bring to a permanent state and final conclusion the complete status of the record of all transactions . . . ." It sets forth a method of casting up the items and transactions of the partnership, but there is no express agreement that the items found by the accountants are to be accepted as correct or that the audit shall constitute the state of account between them.

In Moyer v. Closs, 186 Okla. 354, 97 P. 2d 901, it was said:

"The general rule is stated in 1 C. J. 683, as follows:

"To constitute an account stated each party must understand the transaction as a final adjustment of the respective demands between them taken into consideration in the accounting. Hence the binding force of an account stated will not be given to the mere furnishing of an account or other transaction which was not with a view to asserting a claim, establishing a balance due, or finally adjusting the matters of account between the parties."

The first paragraph of the syllabus of the Moyer case reads:

"To constitute an account stated the transaction must be understood by each party to be a final adjustment of the respective demands between them taken into consideration in the accounting."

In the absence of a provision in the contract that the accounts as found by the auditors would be accepted, the audit cannot be said to be a final adjustment of the matters of account between the parties, or that the audit establishes a balance between them. In the absence of an agreement constituting a final settlement, plaintiff had the right to apply in court for an accounting. The demurrer to the petition was properly overruled.

Upon proof of the termination of the joint ventures and that no balance had been struck and that the net profits had not been determined, the demurrer to the evidence was properly overruled.

In proposition 2 defendants contend that the court's order for distribution of funds was precluded by the contract of December 31, 1942. That agreement, after reciting the joint operations of the parties in carrying out the contracts on the three government projects, provided:

"That any funds arising therefrom, after all accounts and obligations have been fully paid and liquidated, shall be equally divided between the parties hereto, except a sufficient amount shall be withheld and kept thereafter under joint control to cover any expectancy or unforeseen obligation or condition that might arise so long as any likelihood thereof shall exist."

On June 29, 1943, the sum of $400,000 of the entity funds upon agreement of the parties was deposited by Trapp in a joint bank account, subject to withdrawal on jointly signed check.

At the time of answer, defendants asserted that two unforeseen obligations had arisen, a government demand for renegotiation of the contracts and a lawsuit by Earl Tankersley against Tankersley-Trapp Associated. Thereafter other suits were filed naming the entity as a party defendant.

At the time of entry of judgment herein the government's demand for renegotiation of contracts had been settled. Two suits were pending, C. C. Cooke et al. v. Tankersley-Trapp Associated et al., and the Earl Tankersley case.

The Earl Tankersley and C. C. Cooke cases appear to be actions involving alleged obligations of the Dan Tankersley group and not against the Trapp group, nor for any obligations of the Tankersley-Trapp partnership entity. It does not appear that the Trapp group would suffer any injury upon distribution of the entity funds because of these pending cases. There was no evidence presented of any expected or unforeseen obligation or condition arising against the entity for which the funds under joint control might be needed.

Two accountants presented claims for accountancy service rendered long after all the transactions were had in reference to completion of the government projects. It is undisputed that there were entity funds under the control of Trapp aside from the funds in joint control more than sufficient to meet these claims and all the claims included in the trial court's accounting judgment which covered all transactions of the parties.

Whether the sum of $400,000 was the amount contemplated by the joint control provision of the contract of December, 1942, and whether the order of distribution was made in the enforcements of rights under the contract or the order made in furtherance of the judgment in accounting seems immaterial. Under the evidence, at the time of trial, there was no reasonable expectancy to justify the further holding of any sum in joint control.

In proposition 3 defendants assert that the court erred in finding that a custodian of the books should be ap-

pointed and in assessing the custodian's fee against the entity.

On that point the facts are that soon after the plaintiffs filed their petition herein and before answer date, plaintiffs filed a motion which included a request that the court appoint an auditor to make an audit of the books and be custodian of the books and records, with right of the parties to have access thereto. The court refused the request for an audit, but appointed a custodian of the books and records and in the final judgment assessed the custodian's fee against the entity.

The books and records were kept in an office adjoining Trapp's office and under his control. It is undisputed that serious differences had arisen between the parties, and that there existed a strong feeling of animosity between Trapp and Tankersley for some time before, and at all times after, the commencement of this action. We think these circumstances sufficient to justify the court in appointing an independent custodian of the books during the time of preparation for trial and trial of the action, and these circumstances support the court's finding and conclusion. Although defendants made a showing that plaintiffs were never interfered with in making examination of the books, nevertheless, in fairness to both parties, in view of the strained feeling between them, an independent custodian should have been appointed.

Under the evidence it is made to appear that both parties are at some fault for the animosity that existed between them. Under such circumstances it would appear just that the fee allowed the custodian be assessed against both parties or the entity.

"In equity proceedings the allowance and imposition of costs, unless otherwise governed by statute or rules of court, do not always follow the outcome of the suit, but rest in the sound discretion of the court according to the justice of the cause or the facts and circumstances of the particular case."

14 Am. Jr. Costs, 22; Rand v. Nash, 174 Okla. 525, 41 P. 2d 296.

In proposition 4 defendants assign error in that the court permitted the plaintiffs to introduce the cross-examination from the deposition of a witness whose deposition had been taken by the defendants without compelling plaintiffs to declare that the deponent was thereby made plaintiffs' witness. Defendants cite the general rule, as stated in 18 C. J. page 733, §342, as follows:

"Without reference to the fact of who has a deposition taken, it will be considered the evidence of the party who offers it in evidence, and a party offering the deposition of the adverse party cannot urge objections to any portion thereof offered by him. But it is subject to any valid objection."

Plaintiffs offered to read all of the depositions.

Defendants introduced in evidence the re-direct examination from the deposition. As said in Oklahoma State Bank of Cushing v. Buzzard, 73 Okla. 250, 175 P. 750:

"It is not error for the court to permit a party to an action to offer in evidence part of a deposition, without offering all of the deposition, where the adverse party is permitted to use all or any part of said deposition as evidence."

This matter was tried to the court, and it is not pointed out by the defendants that the action of the court resulted in any prejudice to them. We find no reason for defendants to complain.

In proposition 5 defendants assign error as follows:

"A. The court erred in finding that the parties hereto agreed to associate as joint adventurers and each contract or project was to be a separate adventure, and,

"B. The court erred in holding that the defendants were not entitled to an accounting on the Norman Naval Base contract."

In this connection we observe it was early in 1941 when Tankersley and Trapp orally agreed to associate as joint venturers to obtain and complete government defense contracts. The Tankersley group were experienced contractors in various types of construction work, but appeared to be without sufficient finance or financial backing to undertake construction projects of the magnitude contemplated by the government. The Trapp group was without experience in construction work but possessed of finance and financial backing.

The evidence is in sharp conflict as to the terms of the agreement. The defendants contend the partnership was formed to obtain and do cost-plus fixed-fee work only; that cost-plus fixed-fee work was awarded only to contractors selected from the list of qualified contractors on file in Washington; that Tankersley Construction Company, because of insufficient finance, could not qualify before the board set up to pass on and make up the list of contractors eligible for cost-plus-fixed-fee work; that after the association of the parties the entity was able to show sufficient financial responsibility and construction experience so as to be placed on the qualified list; that the association was formed as a general partnership to qualify for, procure and do cost-plus-fixed-fee work and to share the profits therefrom on a fifty-fifty basis; that although other types of government work was done, the same was not contemplated in the beginning and in each instance such other work was entered into only after special agreement for that particular venture.

The plaintiffs contend that the parties agreed to associate as joint adventurers to do any kind of government work that could be procured; that each contract or project was to be a separate adventure; that a special partnership agreement was to be made in the procurement and performance of each government project in which they might become interested.

The government contracts for the construction of defense projects were of three kinds. In awarding what will be referred to as an "open letting contract," the government advertises for competitive bids and the contract is awarded to the contractor who is able to make satisfactory performance bond and who makes the lowest and best bid. In awarding a "negotiated contract" the government calls in a selected contractor whose name is taken from the qualified contractors' list on file in Washington, and negotiates a lump sum contract without advertising and holding a public letting. In the type of contract called the "cost-plus-fixed-fee contract," the government calls in a contractor selected from the qualified list and awards the contract upon a definite and stated cost-plus-fixed-fee basis.

On April 22, 1941, two letters were forwarded to Washington in the name of the entity. One to the quartermaster General of the Army referring to the association of the parties for the purpose of conducting a general construction contracting business and referring to statement attached showing their financial responsibility and construction experience record and requesting that the association be placed on the list of approved contractors and expressing a desire to be awarded negotiated contracts on a cost-plus-fixed-fee basis. The other letter was addressed to the Supervising Engineer, Public Buildings Administration, and contained the same subject matter except no specific reference was made to cost-plus-fixed-fee contracts, but requested placement on the list of approved contractors with a view of being accorded the privilege of submitting bids on construction work to be awarded by that agency.

On June 26, 1941, and July 1, 1941, the entity signed contracts for construction of projects at Fort Sill, Okla. They were successful bidders on these two "open letting" publicly advertised contracts.

On July 8, 1941, contract was executed in the name of the entity with the government for construction of the Enid Basic Flying School. This was a negotiated contract made after the Tankersley Construction Company had been invited to submit a lump sum bid. No contractors were invited to submit bids unless on the approved list of contractors on file in Washington. M. E. Trapp Associated was not listed in the invitation to the Tankersley Construction Company. However, after explanation of their association the entity was accepted. This Enid contract was performed under a special agreement between the Trapp group and the Tankersley group.

In January, 1942, at a time when the Enid projects were nearing completion and the entity had no other work in immediate prospect, Tankersley and Trapp made a trip to Washington. Trapp testified that the purpose of the trip was to further their interest in cost-plus-fixed-fee work in accordance with their original agreement. Tankersley testified the trip was made because of interest in the proposed Camp Gruber Cookson Hills project, and interest in defense projects generally. Check was issued against entity funds after their return, bearing this notation: "Expense of trip to Washington on account of defense work, Cookson Hills etc., Dan Tankersley and M. E. Trapp."

After return of the parties from Washington a bid was prepared on Camp Gruber, but was never filed. "Open letting" bids on projects at Paris, Tex., and at Waco, Tex., were submitted but not accepted. On March 23, 1942, an "open letting" bid was submitted on a project at Camp Hood, Tex., which bid was accepted on two areas. About the same date the Navy Department issued a communication, addressed to the Tankersley Construction Company at Oklahoma City, advising that the Tankersley Construction Company was being considered in connection with a cost-plus-fixed-fee contract on the Norman Naval Base.

Tankersley and Trapp were in Texas at the time and an employee called Tankersley by telephone concerning the communication from the Navy Department. The testimony of the witnesses concerning discussions had by Tankersley and Trapp in reference to the Naval base contract is conflicting. The Norman contract was let on April 8, 1942, to an association of contractors naming Tankersley and three others, but not naming Trapp or any of his associates. The Camp Hood contract was signed by the Tankersley-Trapp entity on April 9, 1942. There were many disagreements and much bitterness between the parties in their dealings in reference to the Camp Hood contract and prior to the award of the Norman contract.

Trapp testified that Tankersley discussed his negotiations with the Navy Department and the other invitees of the Navy in reference to the Norman contract, and that Tankersley stated he was working to get the contract for the entity; that there was no disagreement between them in reference to the entity taking and performing that contract.

Tankersley gives testimony of violent disagreements with Trapp in reference to the bid and contract on Camp Hood; that during the time the Norman job was being considered he expressed an intention of qualifying for the Norman job and was told by Trapp, "You can do as you please. I am not going to have any more to do with you." That Trapp had knowledge of his acceptance of the Norman contract in association with three other contractors, but never made known any claim of interest in the Norman contract until the filing of the cross-petition herein, nearly two years later.

It is noted that several contracts were signed by the parties and several letters exchanged between them over a period of several months following the award of the Norman contract, and which instruments made reference to the past dealings of the parties, but

in none of them was any claim made by defendants of any interest in the Norman contract nor was any reference made to the Norman contract.

The oral evidence presented by the parties in support of their contentions is conflicting. The trial court was in a better position to judge the credibility of the witnesses than this court. The written evidence presented and the undisputed facts concerning the transaction between the parties prior to the Naval Base award support the findings of the trial court that the parties were not partners until they agreed upon a job and then the partnership agreement extended only for the performance of the particular job, and that the defendants refused to and did not associate nor agree to associate themselves with the plaintiffs in securing the award and in the construction of the Norman Naval Base. Under such circumstances, we cannot say that the findings of the trial court are against the clear weight of the evidence; the conclusions and judgment based thereon should therefore be sustained.

The judgment is affirmed.

HURST, C.J., DAVISON, V.C.J., and RILEY, CORN, GIBSON, and LUTTRELL, JJ., concur.

Rehearing Denied March 30, 1948.